```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: MAY 2 8 2013
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- X
                                                         :
DELSHAH GROUP LLC,                                       :
                                    Plaintiff,           :
                                                         :          09-Civ-6909 (KBF)
                  -v-                                    :
                                                         :          OPINION & ORDER
ATIT JAVERI, ASHER ROSHAN ZAMIR,                        :
ZAMIR EQUITIES LLC, and ZAMIR                           :
MANAGER 40 LLC,                                         :
                                    Defendants.          :
                                                         :
-------------------------------------------------------- X

KATHERINE B. FORREST, District Judge:

The securities laws are not an insurance policy for investments gone wrong,

inexperience, bad luck, poor choices, or unexpected market events. Here, despite

years of litigation and a bench trial lasting several weeks, the Court is left with the

firm conviction that plaintiff Delshah Group LLC ("Delshah") seeks just that – an

insurance policy. Indeed, after years of discovery, plaintiff's case fails at every level.

The Court does not find that defendants made a material misstatement or omission,

that plaintiff reasonably relied on any misstatements or omissions, that defendants

acted with scienter, or that plaintiff's losses were caused by the materialization of a

concealed risk.

Therefore, and for the reasons set forth below, the Court finds for defendants

as to both causes of action (asserting violations of §§ 10(b) and 20(a) of the

Securities Exchange Act of 1934). 15 U.S.C. §§ 78j(b), 78t(a).

## I.   THE PARTIES' POSITIONS

The parties agree on one fact: that the 40 Broad Street Project (the "Project" or the "40 Broad Project"), a Manhattan commercial to residential condominium conversion, was an investment failure. Plaintiff lost the bulk of its investment and defendant Asher Zamir personally lost in excess of $15 million. The central issue in this lawsuit, brought pursuant to §§ 10(b) and 20(a) of the Exchange Act, is whether defendants – Zamir and companies he managed or controlled (Zamir Equities LLC and Zamir Manager 40 LLC),[1] along with Zamir's employee, Atit Javeri – committed securities fraud in connection with that failure.

### A.   Plaintiff's Claims

On March 29, 2007, plaintiff Delshah, represented by its managing member, Michael Shah, purchased membership interests the 40 Broad Street Project. At the time of its acquisition, the membership interests in the Project were fully bought out and Yahalom 40 LLC – the entity issuing the membership interests – was not seeking additional capital investment. As discussed below, Delshah approached defendants in connection with making an investment.

---

[1] Plaintiff's Exhibit 52 provides a schematic of the corporate structure. The building at 40 Broad Street in New York City was acquired by a company called 40 Broad LLC. 40 Broad LLC was owned and controlled by Zamir. Zamir organized a series of companies to manage and supervise the Project. Among those companies was 40 Broad Mezz LLC. The 40 Broad Mezz LLC, in turn, is managed another company, Yahalom 40 LLC ("Yahalom"). Yahalom is a Delaware limited liability company. Yahalom issued membership interests in the Project. Each investor signed a Subscription Agreement in connection with its acquisition of interests. Thereafter, each investor was listed as having "capital" in Yahalom. Zamir Manager 40 LLC ("Zamir Manager") was the sole manager of Yahalom. Zamir Manager 40 LLC is a limited liability company organized under the laws of the State of Delaware. Zamir Equities LLC, wholly owned by Zamir and members of his family, is the sole manager and controls Zamir Manager. Defendants do not dispute that the membership interests in Yahalom constitute securities within the meaning of the securities laws. While the structure of these interlocking companies is complicated, it plays no material role in this dispute.

Delshah paid $4,185,000 for its interests, which included a purchase of $3 million from Zamir's interests and $1,050,000 from those of Javeri. The remainder constituted a fee paid to Javeri for his interests. In connection with its purchase, Shah executed both the Limited Liability Company Agreement of Yahalom 40, LLC ("Yahalom Operating Agreement") and the Yahalom 40, LLC Subscription Agreement ("Yahalom Subscription Agreement") on behalf of Delshah. (See Pl.'s Exs. 75 (Yahalom Operating Agmt.), 56 (Yahalom Subscription Agmt.).)

According to plaintiff, in connection with its purchase it relied upon the following material misrepresentations:

1. That the project was running smoothly, meaning that it was on schedule and on budget;

2. That the Project was "functionally bought out";

3. That Javeri, representing defendants in the purchase, represented that he was "project manager";

4. That, as of March 6, 2007, no part of the $7 million in contingency funds established for the Project had been used and that those funds were therefore available in case of any future cost overruns;

5. That a document entitled a "G702" could not be provided to plaintiff because it was an internal document only;

6. That Javeri's father was only willing to sell a $1 million "portion" of his investment in the Project;

3

7. That plaintiff's purchase needed to close as of March 23, 2007 at the latest;

8. That the pro formas and associated financial information defendants provided ("Pro Formas") to plaintiff prior to its purchase were accurate and reflected the current status of the Project;

9. That an Excel spreadsheet prepared by Shah and sent to Javeri for his review was accurate; and

10. That any cost overruns caused by delays associated with the Setai Group (a company that had entered into a branding relationship with the Project) or with the architectural plan, designs or changes, would be paid for by Setai.

Plaintiff also asserts the following material omissions:

1. Javeri failed to inform Shah that the interest he was selling constituted his entire interest in the Project;

2. That Shah was shown a figure representing Zamir's interest in the Project's capital account on the day of the closing, but that figure constituted the aggregate interest of the Zamir family and not Zamir's personal interest;

3. That Javeri failed to show plaintiff an email chain dated March 6, 2007, allegedly showing that the entire hard cost contingency of approximately $5.8 million had been depleted and the project was $3.6 million over budget;

4

4. That Javeri failed to inform plaintiff that a meeting had been set up between the ownership and senior mezzanine lenders for March 6, 2007 to discuss the contingency, the Anticipated Cost Reports ("ACRs") and increasing hard cost budget;

5. That the timeline that plaintiff had been provided was not the actual timeline for the project; and

6. That Javeri failed to inform plaintiff that the construction drawings were not complete and construction could not move forward until the drawings were finalized.

7. That individual condominium unit owners would be assessed an annual fee of $500,000, pursuant to the Setai Condominium Operating Plan.

8. That defendants failed to inform plaintiff of several material aspects of the restaurant and spa component of the Project: namely, (1) the existence of an undisclosed agreement whereby Zamir's wholly-owned entity, 40 Broad Commercial, retained the exclusive right to purchase the Spa and Restaurant units at set prices; (2) the existence of a 15-year lease of the Spa and Restaurant to benefit 40 Broad Commercial; and (3) the "build-out" of the Restaurant and Spa would be paid for by 40 Broad LLC.

Plaintiff asserts that defendants' culpable state of mind is demonstrated by the fact that Javeri and Zamir both benefitted in a personal and concrete way because they received cash for the interests fraudulently sold to plaintiff. Plaintiff asserts that adequate reliance is demonstrated by virtue of the fact that Shah was

not a sophisticated investor and had no previous experience in this type of project; and that, in any event, reliance is presumed in omission cases when the facts alleged to have been withheld are material.

Plaintiff alleges that the material misstatements and omissions induced its purchase – thereby meeting the requirement of transaction causation. Plaintiff also asserts that loss causation is demonstrated by the materialization of what it asserts were the known and concealed risks that the project was not running smoothly and was not on time or on budget, resulting in the Project's non-completion and a near total investment loss.

### B. Defendants' Responses

Defendants have, as one would expect, a variety of responses: they assert that truthful and accurate information was provided to plaintiff prior to its acquisition and deny that any misstatements were made. They also deny that the purported omissions occurred, or, alternatively, argue that the information was not required to be disclosed. Defendants further assert that plaintiff's reliance on statements made by Javeri, an inexperienced young man just out of college, was unreasonable (and that if, in fact, he was the "project manager" that should itself have presented a red flag), that no statements or omissions were made with scienter, that the lack of actionable misstatements or omissions results in a lack of transaction causation, and that plaintiff's singular motivation to invest was its view that sales prices of apartment units were increasing. Defendants assert that the Project's failure was due to unexpected construction delays occurring subsequent to

plaintiff's purchase, along with the collapse of the real estate and financial markets in 2008.

The Court held a bench trial lasting several weeks during which it heard from eleven witnesses and reviewed well over 100 admitted documents. The Court applies a preponderance of the evidence standard of review to make the below findings of fact.

## II.   FINDINGS OF FACT

### A. The Witnesses

Based upon the demeanors of the various witnesses who testified live at trial, the Court makes the general finding that plaintiff's representative, Shah, lacked consistent credibility.[2] The Court has no doubt – and indeed there is no dispute – that he and the other investors in Delshah lost several million dollars in connection with their securities transaction. However, Shah's testimony came across as contrived; he contradicted himself at various points, was contradicted by testimony

---

[2] Prior to trial, defendants had brought a motion for an adverse inference against plaintiff on the basis of spoliation of evidence. (ECF No. 84.) In short, Shah claimed that the computer on which he had maintained emails and documents relating to the matters at issue in this litigation had malfunctioned at some point; he had undertaken to search out and transfer to another computer certain emails that he thought might be relevant to any future claim. He did not, however, retain all emails relevant to the issues in this lawsuit. The Court denied the spoliation motion based on an insufficient showing of the required culpable state of mind. (ECF No. 97.) However, at trial, testimony has elicited that at the time of the computer malfunction, plaintiff was already contemplating the possibility of a lawsuit. Defendants were able to obtain certain documents containing admissions from plaintiff regarding the expected completion date (Defs.' Ex. RRRR) from subpoenas to other Delshah investors. In addition, at trial, defendants elicited on cross-examination of Saahil Mehta (a Delshah investor who worked with Shah on due diligence for the 40 Broad Project) that Mehta had not produced his emails but had reviewed them in preparation for his testimony. As a result of the testimony elicited at trial from Shah and Mehta regarding their document retention and production, this Court believes its prior ruling on spoliation could well be revised. The Court finds Shah's conduct questionable, to say the least. However, since the evidence in favor of defendants in this case is already so overwhelming, the Court need not now make a finding of spoliation or impose a penalty.

from more credible witnesses, and was contradicted by documents.   The Court was left with the distinct impression that he was prepared to say whatever he deemed necessary to obtain a judgment in Delshah's favor.[3]

Similarly, the Court found plaintiff's other major witness, Saahil Mehta, who had worked with Shah on the due diligence in connection with the securities purchase, also lacking in consistent credibility. His testimony appeared rehearsed on specific points and he was unable adequately to explain direct contradictions between his prior deposition testimony and his trial testimony.  At times, when taken off script by questions from the Court or on cross-examination, he made statements that undermined plaintiff's case.  Mehta appeared to be trying to say what he deemed necessary to support plaintiff's claim without particular regard for the truth.

Plaintiff also offered the testimony of Ben D. Nolan on the issue of loss causation. (Court Ex. 8 (Nolan's Report accepted as direct testimony as modified by the Court's Order dated October 26, 2012, ECF No. 113).) Nolan opined that the Project was behind schedule and over budget in March 2007 and that these issues "materialized" into the ultimate failure of the Project. (See, e.g., id. at 19.) This analysis lacked fundamental indicia of reliability.

First, despite testifying to a methodology that he has previously utilized to assess the reason for construction delays, including interviews with construction managers and review of construction-related documentation, he had done none of

---

[3] Shah received a J.D. from Harvard Law School and also practiced as an associate at Wachtell, Lipton, Rosen & Katz for a couple of years prior to going into business for himself.

that here. (Tr. at 2309-11.)  In this instance, he opined that the delays dating to
March 2007 caused the Project to fail, without ever speaking with a single
individual from the construction team or reading their deposition transcripts.  (Tr.
at 2280-85, 2298-99.) (Indeed, plaintiff failed to offer any testimony from any
member of the construction team to assist it in supporting its theory that
intractable construction delays that existed as of March 2007 proximately caused
the loss.)  Nolan also failed to analyze the specific reasons for any delays he believed
existed as of March 2007. (Tr. at 2364-68, 2383.) As a result, his opinions fail to
account for the possibility that, even assuming there were delays and cost overruns
as of March 2007, that those delays and overruns were not resolved (and that
subsequent delays and overruns actually caused the Project to fail). Nolan, in fact,
agreed that all construction projects bear an inherent risk of schedule delay. (See
Dep. of Ben Nolan ("Nolan Dep."), August 3, 2012, at 40:20-22, 151:6-9, 152:6-8,
ECF No. 141.) He also testified that contingencies for cost overruns are built into
projects because of inherent risks. (Id. at 42:17-23.)

Nolan further opined that the drop in the real estate market in 2008 was not
causally related to the Project's failure – without ever having done any particular
market analysis in that regard. (Tr. at 2276-79.)  Generally, apart from several
admissions Nolan made when taken off script, the Court found that he was hired to
state certain opinions – without particular attention to whether the facts supported
those opinions.

In contrast, the Court found the testimony of defendants' fact witnesses credible. The Court found Zamir sincere and forthcoming. He readily acknowledged his responsibility for the Project and that he was the boss. (Tr. at 322.) He also testified credibly that prior to plaintiff's purchase of the securities, he expected that its representatives (Shah and Mehta) would receive any information sought. (Tr. at 322-23.) He testified credibly that as of March 29, 2007, the date of plaintiff's closing on the transaction, he strongly believed that the Project would come to a successful and profitable conclusion (tr. at 558-59); he did not believe that at that time the Project was behind schedule or had any significant cost overruns (id.). His testimony regarding his willingness to sell his shares when solicited by plaintiff to do so was also credible. The Court found it significant that ultimately, even after March 2007, Zamir continued to make personal investments in the Project including investing an additional $11 million in loans (which was ultimately lost). (Tr. at 378-79.)

The Court also found the testimony of Javeri credible. Javeri's demeanor was serious and sincere. He answered questions clearly and forthrightly. He was consistent with his deposition in every material respect. He struck the Court as a bright young man who had been trying diligently to answer questions from Shah prior to Shah's purchase. Javeri credibly explained his rationale for agreeing to sell his interest in the Project, why he originally thought the interest was his father's, why for a time be believed that even with the sale to plaintiff he still retained an

interest in the Project, and that he believed the Project was running smoothly as of March 29, 2007. (See generally, Tr. at 1368-69.)

The Court also found the testimony of Noah Bilenker, who testified on behalf of defendants, particularly important. Bilenker is no longer employed by defendant Zamir or any of Zamir's companies; he is a practicing transactional attorney with the firm Gibson Dunn. Plaintiff did not expose any reason why Bilenker would have any personal interest in the outcome of this lawsuit or why he would perjure himself on behalf of defendants. The Court finds that he testified truthfully and credibly. Bilenker provided significant corroborating testimony supportive of Javeri's and Zamir's key positions in the case – namely, that as general counsel he was involved in major aspects of the Project and, as of March 2007, he understood that the Project was proceeding smoothly. He believed that the Project would have a profitable outcome and that it was on schedule and did not have any significant cost overruns. (See, e.g., Tr. at 1783, 1809, 1848.) Bilenker also provided the most detailed testimony on either side that explained the reasons for the undisputed delays and cost overruns in the Project, as well as the impact of the market downturn on sales velocity and prices. (Tr. at 1823, 1827-28.) Plaintiff did not offer a witness or evidence to rebut the specific delays to which Bilenker testified or with respect to the impact of the market downturn on sales velocity or prices.

Defendants also offered the expert testimony of Michael Falsetta on the issue of loss causation. (Court Ex. 10.) Falsetta had performed valuations of the Project as of March 2007 and also as of January 15, 2008, shortly after a letter (discussed

below) was sent by Zamir to investors in the Project, referring to significant cost overruns and delays. (Id.) At both points, the Project was projected to be profitable. (Id. at 92-95.) The Court found that Falsetta's testimony was helpful, though the fact testimony provided by other witnesses was more important in establishing the lack of loss causation.

### B. The Origins of Delshah's Securities Purchase

Plaintiff's purchase of the securities here has its roots in a social encounter at a wedding in India. There, three young men – Javeri, Mehta, and Shah – attending the wedding of a friend discussed a real estate project in which one, Javeri, was involved. In his first job out of college, Javeri had been hired to work for Zamir on the 40 Broad Project. Javeri testified credibly that he told Shah and Mehta that he was involved in sales and marketing aspects of the Project. (Tr. at 1634.) Shah testified that Javeri told him that he was the "project manager". (Tr. at 669, 842.) Mehta testified at his deposition that he did not know whether Javeri was an "an employee, a trainee or an intern, but he was part of the development". (Tr. at 1956-57.) By the time of trial, Mehta's testimony changed and he testified that he thought Javeri was a "project manager" and one of the "senior members managing the development." (Tr. at 1956-1957.) The Court finds that the weight of the credible evidence is that Javeri appropriately represented himself as involved in sales and marketing.

By the time of the wedding, the Project had lined up all of the equity funding it needed and closed on a significant construction loan on October 31, 2006. The

12

parties do not dispute that in January 2007 Mehta approached Javeri about the possibility of investing in the project. (Tr. at 1627.)

In a PowerPoint presentation to potential investors in Delshah (which would, in turn, invest in the 40 Broad Project), Shah highlighted the following points: that the Project would be branded as a "Setai" condominium,[4] that 20 units were already under contract for sale, and that the condos would feature attractive sizes, amenities and location. (Defs.' Ex. RRRR.) Shah specifically recognized certain aspects of the New York residential condominium market, noting a "[b]urst of activity in Manhattan in '07; [a]cross all price ranges; [d]ouble digit growth from January '06; [p]eople held back for 2 yrs fearing crash that never materialized; [b]uying trend expected to continue; . . . [e]stimated sell out price: $1250 [per square foot]." (Id. at 5.) Shah's PowerPoint projects a completion date of September 2008. (Id. at 7.)

## C. Shah and Mehta Lacked Experience in Conversion Projects

Prior to his involvement in the 40 Broad Project, Shah had never been involved in a commercial to residential condominium conversion. (Tr. at 670.) Neither had he been involved in any project that required significant construction. (Id.) He did not know what an "ACR" was at the time of his investment.[5] (Tr. at 972-73.) Mehta did not believe that Shah had sufficient experience to be able to assess

---

[4] The Setai Hotel in Miami Beach had established Setai as a luxury brand; the 40 Broad Project had entered into a branding agreement with Setai. (See e.g., Pl.'s Ex. 104; Defs.' Ex. RRRR.)
[5] Bilenker testified that an "ACR" is an "anticipated cost report". (Tr. at 1806.) He testified that ACR's are not reflective of actual costs and the cost of various items can be decreased by changing materials or vendors by a process called "value engineering." (Tr. at 1807-08, 1848-49.) One of the material omissions plaintiff claims is defendants' failure to inform it of an ACR submitted by the construction company. Notably, Shah testified that he did not know what an ACR was in March 2007. He did not testify that he ever asked if there were any ACRs.

13

the status of a construction project based on a visual inspection. (Tr. at 2001.) Shah had never seen a construction site for an office to residential condominium conversion before seeing the 40 Broad site. (Tr. at 848.) When he viewed the 40 Broad site, he was accompanied only by Mehta and Javeri. (Tr. at 848-49.) Shah did not have anyone with him who had experience in seeing or evaluating progress on an office to residential condominium conversion project. (Tr. at 849.) Shah never spoke to a construction manager. (Tr. at 1003.)

At the time of Delshah's multi-million dollar investment, Shah, Mehta and Javeri were all in their 20s. (Tr. at 839.) Mehta came to work with Shah in December 2006. (Tr. at 835.) Shah did not believe that Mehta had had any prior real estate experience, (tr. at 836), and was going to teach him. (Id.) Shah was unaware as to whether Javeri had any prior experience in real estate. (Tr. at 840.) Shah testified that he does not think that he questioned Javeri as to whether he had any experience in real estate management, (id.), he does not recall asking Javeri whether he had had any prior experience in real estate construction, (tr. at 841), and he does not recall asking Javeri whether he had had any prior experience in condominium conversion (id.). Shah did, however, recall asking Javeri about a prior project called "Miraval" – which he saw displayed on a poster at Zamir Equities' office; Javeri told him that the project "was a disaster." (Tr. at 845.)

Together, Shah and Mehta performed the due diligence on the 40 Broad Project. (Tr. at 837.) Shah and Mehta agreed they were "the guys with the real estate experience" in the Delshah Group. (Tr. at 837.)

Shah executed the Yahalom Subscription Agreement to purchase Javeri's

interest. (Defs.' Ex. ZZZ.) In that agreement, as Manager of Delshah, Shah

acknowledges

> Section 4(e): Economic Risk: The Subscriber recognizes that the Company
> Interest, as an investment, involves a high degree of risk including, but not
> limited to, the risk of economic losses from operations of the Company and
> total loss of the Subscriber's investment . . . .
>
> (f) Investment Risk: The Subscriber acknowledges that the purchase of the
> Company Interest is a speculative investment which involves a substantial
> degree of risk of loss by the Subscriber of the Subscriber's entire investment
> in the Company, that the Subscriber understands and takes full cognizance
> of the risk factors related to the purchase of the Company Interest...
>
> (g) Investment Experience: The Subscriber is an experienced investor in
> unregistered and restricted securities and high-risk ventures and is capable
> of evaluating the merits and risks of an investment in the Company interest
> and has obtained, in the Subscriber's judgment, sufficient information from
> the Company to evaluate the merits and risks of an investment in the
> Company . . . .
>
> . . . .
>
> (I)Investor Awareness: the Subscriber acknowledges, represents, warrants,
> agrees and is aware that . . . (iii) An investment in the Company is an illiquid
> investment and the Subscriber must bear the economic risk of the investment
> in the Company for an indefinite period of time . . . .

(Id.; Tr. at 994 (Shah signed all closing documents as Manager of Delshah).)

### D. The Project Was On Time in March 2007

The centerpiece of plaintiff's case is that as of March 29, 2007 – when

Delshah closed on its securities purchase – the Project was in what plaintiff's

counsel referred to as a "death spiral". The Court does not find this to be the case.

15

a. <u>The Timeline</u>

Plaintiff spent a significant amount of time at trial attempting to demonstrate that the pre-purchase Project timeline provided to plaintiff stated that the Project should have been halfway done at that point, but that, in fact, it had barely commenced.  Plaintiff grounds its position in the "pro forma" ("Pro Forma") Javeri provided to Shah and Mehta at the outset of discussions regarding Delshah's potential securities purchase.  (Pl.'s Ex. 7.)

The Court finds that the credible testimony of Javeri, Bilenker, and Zamir and the most reasonable reading of the Pro Forma and loan documentation demonstrate that, as of March 2007, the operative timeline had a completion date of the fall of 2008.

This conclusion comes despite Shah's testimony that he was led to believe that by March 2007, the Project was more than halfway done.  Shah's testimony is flatly contradicted by the only reasonable reading of the Pro Forma he was provided in early March by Javeri (Pl.'s Ex. 7; Email from Atit Javeri to Michael Shah, Mar. 2, 2007, Defs.' Ex. H) and flatly contradicted by Javeri's credible testimony that he had never told Shah that the Project was that far advanced (and in fact told Shah that the Project was expected to be completed in October 2008) (tr. at 1369).

The Pro Forma (Pl.'s Ex. 7) contains a timeline that sets the date of the closing of the construction loan as "month 1".  The Pro Forma then tracks each month of construction from that point.  Since the construction loan closed at the end

of October 2006, November 2006 is therefore "month 1." (See Pl.'s Ex. 101 (Building Loan Agreement dated October 31, 2006 setting forth completion date as October 2008).) Bilenker testified credibly that "month 1" on the Pro Forma was November 2006. (Tr. at 1846.)

With November 2006 as month 1, the timeline shows Temporary Certificates of Occupancy ("TCOs") coming in by month 16, or February 2008. (Defs.' Ex. H.) Project completion was expected by Month 24, or October 2008. (Id.) Bilenker testified credibly that the Project completion date set forth in the construction loan was October 2008. (Tr. at 1783.) This is corroborated by the loan documentation. (Building Loan Agmt. Art. 1, Oct. 31, 2006, Pl.'s Ex. 101 (noting "'Completion Date' – Subject to extension by Force Majeure, October 31, 2008.").)[6]

Finally, Shah could have discovered the true progress of the Project through reasonable diligence. He visited the building site and had the opportunity to assess construction progress. (Tr. at 847-853.) The Court finds that had he possessed the requisite expertise himself – or retained a third party with that expertise – this site inspection would have disclosed the precise progress of the Project.

### b. On Schedule Per the Timeline

The Court credits the testimony of Javeri, Zamir and Bilenker that, as of the end of March 2007, each of them believed that the Project was on schedule. (See Tr. at 1368-69; 163; 1783.) Bilenker testified credibly that in March of 2007 the Project was on schedule and the expected completion date of October 2008 seemed very

---

[6] Even in October 2007, after Shah and defendants had communicated about delays and cost overruns, Shah told investors that he expected delivery of the Project in September/October 2008. (Defs.' Ex. CCCCC.)

secure. (Tr. at 1783.)  According to Bilenker, even in August of 2007, defendants still expected the first TCOs by February 2008 – which was safely within the projected date for completion. (Tr. at 1816.)

Plaintiff also relies upon emails involving an individual named David Amirian for the alleged misrepresentations regarding budget and schedule. (Pl.'s Exs. 20, 21.) Notably, while these emails are described by plaintiff as smoking guns – admissions by an individual involved in the Project prior to March 29, 2007, that the Project was delayed and had overruns – plaintiff chose not to call Amirian.

This was particularly important given the fact that Amirian was portrayed by defendants as prone to hyperbole and/or hysteria.  Javeri described Amirian as a very pessimistic person. (Tr. at 184.) Bilenker testified that Amirian was "melodramatic and alarmist" and "didn't always know what he was talking about" and thus he, Bilenker, was not concerned when he saw Amirian's March 22, 2007, email regarding delays, (tr. at 1898-1900).  Zamir testified credibly that Amirian "got it all wrong". (Tr. at 184.)[7]

In the first of the two Amirian emails, on March 6, 2007, he wrote that the Project was behind schedule and had cost overruns. (Pl.'s Ex. 20.) Amirian's second email is dated March 22, 2007.  In it, he states that a completion date of April 2008 is aggressive and wrong. (Pl.'s Ex. 21.) This ignores the fact that the actual completion date, set forth in the Pro Forma provided to plaintiff prior to its

---

[7] In one of the Amirian emails (Pl.'s Ex. 20), he discusses cost overruns based, in part, on interest calculations.  There was credible testimony that Amirian's job responsibilities did not involve the calculation of interest and that the calculations set forth in his March emails were wrong. (Tr. at 1853, 1767-68; see also Tr. at 1664-1670.)

18

acquisition and in the bank loan documentation, is the fall of 2008. (Pl.'s Exs. 7, 104.) The email also states that TCOs were expected in February 2008 – also the date set forth in the Pro Forma plaintiff received. (Compare Pl.'s Ex. 21 with Pl.'s Ex. 7.) Thus, while the tone of the second Amirian email is concerned and has statements in all caps, it is consistent with the Project continuing to be on the schedule provided to plaintiff and the bank. Neither email is a "smoking gun". It would have been odd to have provided such internal emails to potential investors, given the demonstrably erroneous information contained in them.

Javeri testified credibly that when he received Amerian's email he thought Amirian was "completely wrong" and subsequently found out that his statements were baseless. (Tr. at 1378.) Javeri also testified that the email had to do with only a small portion of the overall Project. (Tr. at 1376-79; 1766-68.) Nevertheless, Javeri responded to the March 6 Amirian email by noting that the Project was proceeding at a "snail's pace." (Pl.'s Ex. 20.) Javeri testified credibly that his own statements referred to the sale and advertising aspects of the Project, which was the area on which he worked directly. (Tr. at 1379.)

In Shah's initial presentation to potential Delshah investors, he projects an overall Project completion date in the fall of 2008. (Defs.' Ex. RRRR at 7.) This is consistent with the Project completion date set forth in the original Pro Forma provided to Shah, which states that all closings would be completed by "Month 24" following the closing of the construction loan – which would have been October

2008. (Pl.'s Ex. 7; Defs.' Ex. H.)  Shah never requested a representation from

defendants with regard to the schedule for construction.[8]  (Tr. at 1003.)

c.   <u>The TCOs</u>

A key issue is whether the Project would be able to obtain a TCO and close on

a unit before July 1, 2008.[9] The condominium Offering Plan (Pl.'s Ex. 2), filed with

the New York State Attorney General's Office, provided that if the Project was

unable to close on a unit that date, the Attorney General's Office could order that

buyers of units be offered the opportunity to rescind their contracts.  In fact, in July

2009, the Attorney General's Office did issue a rescission order.

The original Pro Forma projected that, once the first TCO came in, the

subsequent TCOs would be obtained in four batches over a five month period. (Pl.'s

Ex. 7; Defs.' Exs. H, YYYY.) In an email dated March 21, 2007 (Pl.'s Ex. 103), from

Zamir to Larry Boudabin of Newmark (the construction company), Zamir projects a

completion date of April 2008. Zamir testified credibly that this email was his

attempt to push Newmark to complete the Project even sooner. (Pl.'s Ex. 103; <u>see</u>

<u>also</u> Pl.'s Ex. 24.) Zamir testified credibly that it was his job to try and keep the

Project moving and that his email is reflective of those efforts – not of delays. (Tr. at

137-141.)

Mehta testified that prior to the acquisition, he was told by Bilenker that

TCOs were expected by February 2008; he also understood that the Pro Forma

---

[8] At trial, Shah testified that he ultimately relied on his own timeline.  (Tr. at 903.)
[9] Even the Amirian emails predict that the first TCOs would be obtained prior to the February 2008 date given to Delshah and that Delshah stated to its own investors in the PowerPoint discussed above. (<u>See</u> Defs.' Ex. RRRR; Pl.'s Ex. 20; Defs.' Ex. I.)

stated that TCOs were expected by February 2008. (Tr. at 2114; Pl.'s Ex. 7; Defs.' Ex. H.)

The Court finds by a preponderance of the credible evidence that at the time of plaintiff's acquisition, the Project was on track to obtain a TCO and be able to close on a unit well before the end of June 2008.

This is corroborated by the fact that even in the December 2007 letter from Zamir to investors (which was then sent with minor changes from Mehta to Delshah investors) TCOs are projected to be obtained beginning in February 2008. (Defs.' Ex. FFFFF.)

### E. The Cost Overruns and Projected Profits

The preponderance of the credible testimony was that some cost overruns occurred, but that they occurred in an environment of increasing prices for unit sales. As a result, for a substantial period of time following plaintiff's acquisition, even if there had been cost overruns, plaintiff would have received the same or even a higher profit than originally anticipated due to the increasing price per square foot associated with ongoing unit sales.

Shah testified that prior to plaintiff's securities purchase he was told that the Project was on budget. The Court did not find this testimony credible. The Court did credit Javeri's testimony that, prior to plaintiff's purchase, he informed Mehta that the project had some cost overruns but he believed they could be "value engineered" (e.g., bid out for lower cost items). (Tr. at 1404-10.) This testimony is corroborated by an email exchange between Javeri and Mehta in which Mehta

requests information on defendants' plans with respect to cost overruns. (Defs.' Ex. C; Tr. at 1516-18, 2047-49.) The Court credits Javeri's testimony that this email exchange followed his disclosure to Mehta that there had been some insignificant cost overruns. (Tr. at 1402.)

Bilenker also testified credibly that as of March 2007 there were no significant budget issues. (Tr. at 1809.) He also testified credibly that prior to plaintiff's purchase the contingency had not been spent. (Tr. at 1848-50.) According to Bilenker, to the extent that there were any anticipated cost overruns in March 2007, they were expected to be value engineered to a point where the Project would remain on budget. (Tr. at 1874.) This testimony was particularly important and credible in that it came from a witness who followed the Project closely and was involved in numerous Project-related meetings with Zamir and the lenders.[10]

Plaintiff points to Javeri's denial of its request for a document called a "G702" (Defs.' Ex. BBBBB) – an American Institute of Architects form used by construction

---

[10] There was significant testimony at trial about a series of reports by the "Merritt & Harris" company. Several of these reports were admitted for limited purposes; one report was admitted for the truth (because defendants' expert had relied upon it in drafting his report). (Pl.'s Ex. 46; Defs.' Ex. YYYYY.) Plaintiff argued vehemently that these reports put the lie to defendants' assertions that the Project was on time and on budget in March 2007. According to plaintiff, a Merritt & Harris report, not admitted for the truth, states that the Project is behind schedule – and has a timeline that starts the Project months before the closing on the bank loan. (Pl.'s Ex. 46; Defs.' Ex. YYYYY.) This document became the Holy Grail for plaintiff's case. Plaintiff does not assert that it requested or received the Merritt & Harris reports prior to closing. There is therefore no evidence in the record that it relied on any schedule attached to a Merritt & Harris report.

For reasons known only to plaintiff, it chose not to call any witness from Merritt & Harris who could have properly authenticated the reports or discussed the methodology for inclusion of the information which was contradicted by live testimony and numerous other documents. The Court found no basis upon which to credit the timeline or statements contained in the Merritt & Harris report relating to the period of March 2007. (Pl.'s Ex. 46.) The Court certainly found no basis upon which to credit that unauthenticated report with no live witness to testify as to its origins or accuracy. Bilenker testified that the Merritt & Harris reports were neither regularly reviewed nor relied upon by defendants. (Tr. at 1858.) Javeri testified credibly that he never saw the Merritt & Harris reports until the discovery phase of this case. (Tr. at 1380-81.)

contractors to request progress payments – that would have disclosed that the "contingency" funds allocated for the Project had been spent. (Tr. at 977.) This is contradicted by the fact that the face of the G702 at issue does not contain a statement of an actual cost overrun on the Project as a whole (Defs.' Ex. BBBBB; Pl.'s Ex. 41) and Javeri testified credibly that he did not understand at the time what a G702 was (tr. at 1744).  Plaintiff himself undercuts the materiality of the G702 issue and any reliance element by calling it a "red herring" that simply would have raised questions had he seen it. (Tr. at 976.) Moreover, the last page of Plaintiff's Exhibit 119 is the version of the G702 to which  Javeri had access and it does not reflect that any portion of the contingency had been spent (as was reflected in other versions of the G702 from materials subpoenaed from the construction company, Newmark). (See, e.g., Pl.'s Ex. 94A.) Plaintiff did not call a witness from Newmark to testify as to the meaning of the G702.

Plaintiff also points to an email discussion about a meeting with lenders in early March – which was preceded by an email exchange discussing the ACR and how the numbers on the ACR could be brought down. (Pl.'s Exs. 10, 14, 16, 39.)  The Court credits the testimony of Zamir and Javeri that these discussions were ordinary course discussions – and that there were recurring discussions between defendants and the construction manager about costs generally. (Tr. at 341-43.) Bilenker testified that value engineering was a reasonable way to deal with potential cost overruns. (Tr. at 1807.)  At trial, Shah testified that prior to Delshah's securities purchase in March 2007, he is not sure he knew what an ACR was.  (Tr.

at 972). At his deposition he testified that he did not know what an ACR was at that time. (Tr. at 973.)

Javeri, Zamir and Bilenker also credibly testified that prior to and for a long time following March 2007, the Project was expected to be profitable based on the sales of apartment units at increasing prices per square foot. For instance, in an email on June 29, 2007, Javeri told Shah that, although the Project had some cost overruns, it also had 55 sales and was averaging $1398 per square foot on additional sales (with a $1340 blended rate on the 55 units that had been sold); Javeri stated his expectation that the sales "can make up for the over-runs." (Pl.'s Ex. 26.)

Bilenker testified that units were originally selling for an average of $1250 per square foot but by October 2008 this had increased significantly and, if the remaining units sold at the increased prices, this increase was expected to offset any cost overruns. (Tr. at 1843-44.)

According to Javeri and Zamir, even as of June 2007, when there was a growing awareness of cost overruns, the actual sales of units were expected to leave investors in the same profit position as previously anticipated. (Tr. at 362-63, 593-95; see also, Pl.'s Ex. 26.)

Mehta testified that he learned about significant cost overruns in June 2007. (Tr. at 2100; Defs.' Ex. K.) At that time, Mehta did not ask how there could be cost overruns if it was in fact the case that the Project had been "functionally bought out" (further undercutting plaintiff's position on this alleged representation). In

24

fact, his email response to Javeri relating to the cost overruns simply states "[c]ost overruns –hope it's not too bad" and then immediately asks "what about the Asians?", other potential investors. (Defs.' Ex. K.) This is not an email from an investor who is surprised or shocked to learn for the first time that there are cost overruns. Mehta testified that he told Shah all of the details of the Project and would have told him this information as well. (Tr. at 2103.) At that time, Mehta believed that the increase in the price of sales would offset any cost overruns. (Tr. at 2107-12.)

Bilenker was the only witness who testified to any real extent regarding the reasons the Project experienced delays. Plaintiff did not present any evidence as to the reasons for any delays allegedly occurring prior to its securities acquisition. Nor did it rebut any of the evidence presented by Bilenker regarding the reasons for the delays following plaintiff's acquisition. According to Bilenker, the turning point on costs occurred in the summer of 2007. (Tr. at 1823.) This was months after plaintiff's acquisition.

In August of 2007, Bilenker sent an email to Shah stating that the Project was over budget. (Tr. at 1815; Defs.' Ex. VV.) As stated above, despite those overruns, however, the Project was still expected to be profitable. (Tr. at 1841.) At this time, units were selling at an average of $1350 per square foot. (Id.) Even in December 2007, when Zamir sent an email to Delshah and other Project investors regarding the cost overruns and delays, the Project was still expected to be profitable; units were selling for between $1300-1400 per square foot. (Tr. at 1839-

40; Pl.'s Ex. 82.) Bilenker testified that at these per-square foot rates, the Project was expected to be just as profitable as at earlier times. (Tr. at 1822.) In fact, Mehta made a few changes to Zamir's letter to investors and sent it to the Delshah investors in early January 2008. (Defs.' Ex. FFFFF.) Mehta's letter to Delshah investors then stated the same view Zamir had stated in his letter (though put in terms of "we"): "[We] feel quite positive about the residential sales and are confident you should receive a very strong return on your investment as promised." (Id.) The pro forma attached to this letter projects TCOs being obtained in February 2008, with final TCOs in July 2008 and sell out complete as of August 2008. (Id.)

Bilenker testified credibly that in the spring of 2007, there were issues with tenants in the building and contractors, and that these issues slowed demolition. (Tr. at 1823.) He also stated that as the design was converted into construction drawings, a lot of contractors "came back with their hands out"; the contractors blamed their increased costs, in large part, on increasing steel costs. (Id.) In addition, Bilenker testified that, in the summer of 2007, there were delays in receiving windows for the curtain wall in the back of the building. (Id.)

The Court also credits defendants' arguments that design changes were among the reasons for the cost overruns. (See, e.g., Tr. at 2110.) Mehta did not dispute that such design changes were a cause of the cost overruns. (Id.) Shah never requested that defendants provide a representation in the transaction document regarding the Project's budget. (Tr. at 1004.)

### F. "Functionally Bought Out"

26

Throughout the trial, one of plaintiff's constant refrains was that Shah and Mehta were told that, as of March 2007, the Project was "functionally bought out." According to Shah, being "bought out" meant that the building materials and other commodity costs had been bid out and tied into a contract – thereby limiting the amount of unexpected cost overruns later. Shah testified that Javeri told him that the Project was "functionally bought out." (Tr. at 854 ("A: Absolutely, those were his words. Q: His words were functionally bought out? A: Yeah. Q: You recall that as you sit here today? A: Sure?").) The Court did not find this testimony credible. Indeed, Shah's precise recollection at trial stood in stark contrast to his deposition testimony in which he admitted that he had no recollection of what, if anything, Javeri had said to him about the buyout but assumed that Javeri must have told him that it was bought out because "it is something that I would have likely asked and it is something that he would like[ly have] answered and had he said no . . . I would have likely said then that is a big red flag . . . ." (Tr. at 855-857.) Shah concluded at the deposition that, because he decided to invest, Javeri must have told him that the Project was fully bought out. (Id.)

As an initial matter, the Court notes that the word "functionally" is a word used by plaintiff a number of times at the trial – and never by defendants. (See, e.g., Tr. at 6, 7, 22, 27, 31, 49, 162, 215, 223, 713, 714, 717, 786, 794, 1310, 1528, 1544, 1569, 1884.) But, more importantly, the Court credits Javeri's testimony that, prior to plaintiff's purchase, neither Shah nor Mehta ever asked if the Project was bought out. (Tr. at 1405.)

27

### G. Javeri's Interest

Shah testified at trial that at the time Delshah made its purchase, he understood that it was buying a portion – and only a portion – of Javeri's father's interest. (Tr. at 859-60.) The Court finds this assertion flatly contradicted by the weight of the credible evidence.

As an initial matter, the Court starts with the uncontested point that it was plaintiff that sought a larger interest than that available from Zamir alone. Plaintiff had lined up a purchase of up to $3 million of Zamir's interest in the Project. Plaintiff and Javeri then discussed that Javeri might be able to get his father to sell a "portion" of his interest. Plaintiff asserts that the facts that this "portion" ended up being the entirety of the remaining Javeri interest and that it was legally owned by Javeri (and not his father) demonstrate that Javeri knew the Project was doomed to fail and also demonstrates that Javeri was personally interested in the sale. Plaintiff argues this interest supports a sufficiently culpable state of mind to support a claim of securities fraud. The Court disagrees.

The Court finds that Javeri did initially portray the interest as his father's. However, Javeri credibly explained this as based on the fact that his father had provided the money for the purchase; he thought of the investment as his father's but learned prior to plaintiff's acquisition that it was technically his. (Tr. at 1345-46; 1374.) He also testified credibly that he would not have sold the interest without consulting his father. In terms of Javeri's use of the word "portion", he testified credibly that he believed that his father had participated in an earlier capital call

28

and had purchased an additional $500,000 interest that was not part of the proposed sale to plaintiff. (Tr. at 1347.) This testimony is corroborated by a document, Defendants' Exhibit XXXX (discussed at tr. at 1605), which erroneously reflects that additional $500,000.

The Court found incredible Shah's testimony that the facts that (1) Javeri was not selling his entire interest and (2) the interest was owned by Javeri's father were important to his investment decision.  First, plaintiff failed to explain the relevance, from an investment perspective, of the identity of the interest seller (Javeri or his father).  Rather, it appears to the Court that plaintiff latched on to Javeri's initial misunderstanding as to the nature of the ownership as being something that he could characterize as a "lie". In addition, Shah's testimony regarding the importance of Javeri retaining some interest in the Project because it would show that he had "skin" in the game came across as contrived. Had he cared that much, he could have asked for specific information regarding Javeri's remaining capital position prior to closing; he asked for precisely this type of information regarding Zamir's interest. Further, Shah, an experienced transactional lawyer, did not request a specific representation be included in the acquisition documents regarding Javeri's remaining interest.

In addition, the Court found credible Javeri's proffered reason for wanting to take money out of the Project. At the time of plaintiff's purchase, Javeri was interested in the acquisition of a Wall Street building site that he believed would return an even more significant profit than that of the 40 Broad Project. (Tr. at

1373, 1376, 1631.) Plaintiff did not attempt to prove that this alternative project did not exist or that it was not projected to be as profitable as Javeri asserted. Javeri also testified that he actually invested some of the proceeds of his sale of his 40 Broad interest into the Wall Street project. Indeed, in April 2007, Shah sent Javeri an email congratulating him on the "Wall Street" project and suggesting they get together. (Defs.' Ex. DDDD.)

The documentary evidence reveals that both the Subscription Agreement and the Membership Purchase Agreement which Shah executed prior to closing (Defs.' Exs. X, ZZZ; Pl.'s Ex. 72), indicated that Delshah was purchasing Atit Javeri's interest.[11] The Membership Purchase Agreement specifically states "WHEREAS, Assignee [Delshah] intends to buy from Atit, and Atit intends to sell and convey to Assignee, $1,050,000 of Atit's membership interests in the Company (the "Atit Interests" . . .)". (Pl.'s Ex. 72; see also Pl.'s Ex. 73 (Agreement of Assignment of Membership Interests by and between Atit Javeri and Delshah).)

Shah testified about the Membership Purchase Agreement on cross-examination as follows: "Q: So certainly when you received the document on March 23rd, you knew that Atit Javeri was the individual that was selling the million 50 shares, is that correct? A: That's what the document says." (Tr. at 864; see also id. at 866.)[12] Thus, there is no basis for plaintiff to claim a misstatement or omission

---

[11] Shah conceded that he understood prior to closing that the Subscription Agreement showed the shares being transferred were Javeri's and that the money was being wired to Javeri's father's diamond company. (Tr. at 862.)

[12] Shah also conceded on cross-examination that it did not matter to him whether the interest was Atit Javeri's or his father's "Q: It didn't matter to you which Javeri, did it? A: I really didn't think anything of it." (Tr. at 866.)

grounded in a misrepresentation as to the actual owner or the actual portion of that owner's interest being sold. Shah conceded that he did not personally ask how much equity Javeri or his father would have in the Project following the sale of their interests but he "believed" that Mehta had asked. (Tr. at 866.) Shah conceded that he never otherwise corroborated with Javeri that he retained an interest in the Project following the sale. (Tr. at 868.)

### H. The Capital Account Statement

An inordinate amount of time at trial was spent on a single sheet of paper that Shah had requested be provided to him at the closing of plaintiff's acquisition, setting forth what Zamir's remaining equity interest would be and listing Delshah's. This document – Plaintiff's Exhibit 75 (an attachment to the Limited Liability Company Agreement of Yahalom LLC) lists those two interests. One entry states "Asher Roshanzamir*. . . $3,689,265" and another states, "Delshah Group LLC: $4,050,000". The document listed the amounts invested by the remaining investors, but omitted their names.

Plaintiff asserted that the investor names were "whited out" to conceal that Zamir's interest is in fact an aggregate of his family's interest and not his personal interest alone. Plaintiff asserts this form materially misstated Zamir's interest in the transaction and was intended to mislead. This argument, however, makes little sense and is in any event contradicted by the preponderance of the credible evidence.

31

First, despite creating pages and pages of trial transcript on the issue, plaintiff failed to present any reason why, if this issue was of such a material nature, plaintiff had not asked for the ownership information earlier, or why, when Shah was handed the sheet of paper with the whited out names, he did not probe further. (Tr. at 792-93.) In addition, Bilenker offered a credible explanation for the white outs: the other investors wished to keep their identities private. (Tr. at 1796, 1887.)

The Court is also not troubled by the fact that the line relating to Zamir, followed by an asterisk, contains an aggregate number for the interest of his family. Zamir testified credibly that that he put that interest in his children's names (tr. at 278-80), and the Court does not find that he would have been more likely to have cared less about the failure of a Project because his family retained a significant interest while his had been reduced. Zamir's testimony is consistent with that of his accountant, who testified that Zamir often placed assets in his children's names for estate planning purposes. (Tr. at 1266.) The Court also notes that Shah did not seek a representation that Zamir's interest would remain at a certain level following plaintiff's acquisition. Notably, the merger clause in the Agreement of Assignment of Membership Interests relating to Zamir includes representations that Zamir owned the interests he was conveying and that the Company was valid and in good standing, but not one as to remaining interests (the Agreement also states that its text represents the entire agreement of the parties). (Pl.'s Ex. 74.) Without such a representation, Shah knew of nothing to prevent Zamir from selling

the remainder of his and his family's interest the day after the agreement was signed.[13] Thus, irrespective of what Zamir's interest was on the date of the closing, plaintiff had no guarantee that it would remain so.

I.  Why the Project Failed

A critical issue in this case is whether, even assuming that there were material misstatements or omissions, any of them are connected to the Project's failure. The Court finds that, based on the preponderance of the credible evidence, the following factors caused the project to fail: unanticipated delays occurring after plaintiff had purchased its interest, the serious financial crisis in full bloom by the fall of 2008, and the serious deterioration in the New York City real estate market. Plaintiff failed to demonstrate that any existing delays and cost overruns as of March 2007 contributed to the failure.

As set forth above, Bilenker testified credibly regarding a series of project-specific causes – unanticipated as of March 2007 – for delays and cost overruns in the Project. (Tr. at 1823-24.) Moreover, on October 1, 2007, Javeri sent Shah an email explaining that the cost overruns were due to raw material prices and costs associated with the design of the second and third floors had come in higher than anticipated. (Pl.'s Ex. 29.)

---

[13] Plaintiff suggested that the Anglo-Irish loan agreements required that Zamir retain a minimum personal interest in the Project at all times, and that, partially as a result of Zamir's distribution of his interest among his children, the loans were in technical default as of March 2007. (Pl.'s Ex. 101; Tr. at 428-30.) Plaintiff presented no evidence that it knew of this provision in the loan agreements prior to March 2007 or relied upon the provision in making its investment; it is thus irrelevant to plaintiff's claims.

Plaintiff did not attempt to rebut any of this evidence. Indeed, plaintiff did not call a single fact witness to testify regarding the status of the Project in March of 2007 and how any issues that may have arisen after that date would or would not have impacted completion.

Nor did plaintiff dispute the evidence that the financial and housing crises played a role in the Project's failure. Bilenker testified that sales dried up once Lehman declared bankruptcy in September 2008. (Tr. at 1827-28.) Shah testified that the Lehman bankruptcy was "a fairly large shock to the financial system and there was a recession that had to do with home mortgages and the housing bubble." (Tr. at 1103.) Bilenker testified credibly that a TCO was obtained in June 2008 and a unit closed in July 2008, but nevertheless that in July 2009 the New York Attorney General required that rescission be offered to all unit purchasers. (Tr. at 1881-82.)

Mehta testified that the recession caused unexpected damage to the real estate market on the same magnitude as a plague or an earthquake. (Tr. at 2128.-29.) He acknowledged that several prospective buyers had issues with obtaining mortgages in the winter of 2008 – long before the Attorney General's order of rescission. (Tr. at 2148.) He also acknowledged that the velocity of sales started to slow because of market skepticism about real estate. (Tr. at 2128.)

34

The Court notes that while defendants' expert, Falsetta, did not testify as to "why" the Project failed, he did testify that, as of March 2007 and January 2008,[14] the Project was still expected to be profitable. (Tr. at 2527.) Plaintiff presented no evidence that as of March 2007, based on unit sales, Falsetta's profit projections were wrong. Nor did plaintiff present any evidence that Falsetta's valuation as of January 2008 was wrong. Instead, plaintiff's theory is that because the Project was allegedly behind schedule and over budget as of March 2007, there was simply no way it could be completed on time. The Court has found this contention to be without factual basis.[15]

## CONCLUSIONS OF LAW

"Section 10(b) of the Securities Exchange Act of 1934 forbids (1) the 'use or employ[ment] . . . of any . . . deceptive device,' (2) 'in connection with the purchase or sale of any security,' and (3) 'in contravention of Securities and Exchange Commission 'rules and regulations'". Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 341 (2005)(citing 15 U.S.C. § 78j(b)). "Commission Rule 10b-5 forbids, among other things, the making of any 'untrue statement of a material fact' or the omission of any material fact 'necessary in order to make the statements made . . . not misleading.'" Id. (citing 17 C.F.R. § 240.10b-5 (2004).)

---

[14] January 2008 is relevant since that date is immediately after Zamir sent all investors in the Project a letter noting a $24 million cost overrun and delays, but also noted that he expected the Project would still be profitable. (Tr. at 433-34; Pl.'s Ex. 82.)

[15] Notably, plaintiff's own expert on loss causation, Nolan, testified that delays and cost overruns are inherent in any construction project. (See Nolan Dep., designated as cross-examination, August 3, 2012, at 40:20-22, 151:6-9, 152:6-8, 42:17-23, ECF No. 141.)

The securities laws are intended to protect investors against fraud, "not to provide investors with broad insurance against market losses." Dura, 544 U.S. at 345. As such, to prevail on a claim under Rule 10b-5, a plaintiff must prove by a preponderance of the evidence that defendants made a : (1) material misstatement or omission[16]; (2) with a wrongful state of mind (scienter); (3) in connection with the purchase or sale of a security; (4) reliance – or "transaction causation"; (5) economic loss; and (6) "loss causation" – that is, a "causal connection between the material misrepresentation and the loss." Dura, 544 U.S. at 341-42 (citations omitted); see also Lentell v. Merrill Lynch & Co., 396 F.3d 161, 172 (2d Cir. 2005); In re IBM Sec. Litig., 163 F.3d 102, 106 (2d Cir. 1998); In re Parmalat Sec. Litig., 376 F. Supp. 2d 472, 491 (S.D.N.Y. 2005). Here, the third and fifth elements – purchase of a security and economic loss – are not in dispute.

A.  Misstatement or Omission

To be actionable, a statement must be false – it must be untrue. See, e.g., Janus Capital Grp., Inc. v. First Derivative Traders, 131 S. Ct. 2296, 2299 (2011); Decker v. Massey-Ferguson, Ltd., 681 F.2d 111, 118 (2d Cir. 1982)(economic projection that turns out to be faulty is not misstatement for purposes of 10b-5). In this particular case it is worth stating the obvious: if a defendant states the truth, the truth is not actionable under 10b-5. In terms of an omission, it must be a statement which a defendant should have made, and had a duty to make, in order to make other statements made not misleading. See Levitt v. J.P. Morgan Sec., Inc.,

---

[16] In Janus Capital Grp., Inc. v. First Derivative Traders, 131 S. Ct. 2296, 2302 (2011), the Supreme Court stated that for Rule 10b-5, the "maker" of a statement is the person or entity with ultimate control over the statement, including its content and whether and how to communicate it.

710 F.3d 454, 465 (2d Cir. 2013). (This concept is discussed further with regard to materiality, below.)

B. <u>Materiality</u>

An actionable misstatement is not simply one that is false or incomplete; there must be a substantial likelihood that a reasonable person would consider the fact misstated or omitted important in connection with a contemplated securities transaction.  See <u>Basic Inc. v. Levinson</u>, 485 U.S. 224, 238 (1988); <u>Castellano v. Young & Rubicam, Inc.</u>, 257 F.3d 171, 179 (2d Cir. 2001); <u>Azrielli v. Cohen Law Offices</u>, 21 F.3d 512, 518 (2d Cir. 1994). Material facts are those that may affect the desire of investors to buy, sell, or hold companies' securities. <u>Castellano</u>, 257 F.3d at 180. As the Supreme Court has stated, "[t]he question of materiality, it is universally agreed, is an objective one, involving the significance of an omitted or misrepresented fact to a reasonable investor." <u>TSC Indus., Inc. v. Northway, Inc.</u>, 426 U.S. 438, 445 (1976). Courts have been careful not to set too low a standard for fear of burying investors in an "avalanche" of trivial information. <u>Matrixx Initiatives, Inc. v. Siracusano</u>, 131 S.Ct. 1309, 1318 (2011)(citations omitted.) "When contingent or speculative future events are at issue, the materiality of those events depends on 'a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of company activity.'" <u>Castellano</u>, 257 F.3d at 179. No single fact or event is determinative of the materiality inquiry. <u>Id.</u> (citation omitted.) Whether a fact is material is determined as of the date plaintiff entered into the securities transaction at issue. <u>Id.</u> at 181;

see also Radiation Dynamics, Inc. v. Goldmuntz, 464 F.2d 876, 890-91 (2d Cir. 1972).

"A failure to disclose material information is actionable only when the defendant had an affirmative duty to disclose [the] facts." Castellano, 257 F.3d at 179. Disclosure is required only when necessary to make statements made, in light of the circumstances in which they were made, not misleading. See Matrixx Initiatives, 131 S.Ct. at 1321. Knowledgeable corporate insiders have a duty to disclose material facts when selling stock to outsiders. Castellano, 257 F.3d at 179.

### C. Scienter

To prove scienter, plaintiff must demonstrate that defendants acted with the required state of mind. Tyler v. Liz Claiborne, Inc., 814 F. Supp. 2d 323, 334 (S.D.N.Y. 2011)(quoting ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 196 (2d Cir. 2009)) (emphasis in original); see also 15 U.S.C. § 78u-4(b)(2). In cases brought under section 10(b) and Rule 10b-5, that "required state of mind is 'a mental state embracing intent to deceive, manipulate, or defraud.'" Fort Worth Employers' Retirement Fund v. Biovail Corp., 615 F. Supp. 2d 218, 225 (S.D.N.Y. 2009) (quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 319 (2007)). A "strong inference" of scienter "must be 'more than merely plausible or reasonable--it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.'" JP Morgan, 553 F.3d at 198 (quoting Tellabs, 551 U.S. at 314). Thus, the Court "must consider both the inferences urged by the plaintiff and any competing inferences rationally drawn

38

from all the facts alleged," and "must assess whether <u>all</u> of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." <u>Liz Claiborne</u>, 814 F. Supp. 2d at 334 (<u>quoting</u> <u>Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Exp. Co.</u>, 724 F. Supp. 2d 447, 458 (S.D.N.Y. 2010))(internal quotation marks omitted).

The scienter required in section 10(b) and Rule 10b-5 actions "can be established by alleging facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." <u>JP Morgan</u>, 553 F.3d at 198. However, "[w]hen motive is not apparent . . . the strength of the circumstantial allegations [of conscious misbehavior or recklessness] must be correspondingly greater." <u>In re Citigroup Inc. Sec. Litig.</u>, 753 F. Supp. 2d 206, 233 (S.D.N.Y. 2010). Defendants' conduct must be "highly unreasonable and [ ] represent[ ] an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." <u>Liz Claiborne</u>, 814 F. Supp. 2d at 336 (<u>quoting</u> <u>Gissin v. Endres</u>, 739 F. Supp. 2d 488, 503 (S.D.N.Y. 2010)).

Scienter is the mental state embracing an intent to deceive, manipulate or defraud. <u>See</u> <u>Tellabs</u>, 551 U.S. at 319, 323. A court must decide whether all facts taken together — that is, collectively — give rise to a strong inference of scienter.

Id. at 323 (12(b)(6) context). The Court is therefore not to evaluate whether any individualized statement in isolation meets that standard. Id.

Facts giving rise to a strong inference of scienter can be alleged by pleading (1) motive and opportunity to commit the fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness. Kalnit v. Eichler, 264 F.3d 131, 138 (2d Cir. 2001); accord Novak v. Kasaks, 216 F.3d 300, 311 (2d Cir. 2000). Motive and opportunity require plausible allegations of concrete benefits that could be realized by the misstatement, and the likely prospect of achieving such benefits. See Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1130 (2d Cir. 1994). Allegations limited to the type of "corporate profit" motive possessed by most corporate directors and officers do not suffice. See Kalnit, 264 F.3d at 139.

Assertions of conscious misbehavior or recklessness can satisfy the scienter requirement. Conscious misbehavior generally consists of deliberate, illegal behavior. Novak, 216 F.3d at 308. Recklessness requires allegations that a defendant's conduct was highly unreasonable and constituted an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it. See Rothman v. Gregor, 220 F.3d 81, 90 (2d Cir. 2000); Novak, 216 F.3d at 308; Chill v. Gen. Elec. Co., 101 F.3d 263, 269 (2d Cir. 1996) (recklessness can be found in instances of egregious refusal to see the obvious or investigate the doubtful). Plausible allegations that a defendant had access to facts contradicting material public statements, but ignored such facts or proceeded despite them, can be

sufficient to plead recklessness. See Novak, 216 F.3d at 308; see also Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., 531 F.3d 190, 196-97 (2d Cir. 2008)("Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information.").

Allegations in a complaint, including knowledge which the defendants knew or should have known, should be viewed together. See Freudenberg v. E*Trade Fin. Corp., 712 F. Supp. 2d 171, 197-98 (S.D.N.Y. 2010).  In Freudenberg, allegations of scienter were based, in part, on claims that management had been specifically informed of certain deficiencies in pricing and loan losses.  Id. at 198-99.  (There, among the findings, but not essential to the court's decision, was that defendants has also engaged in stock sales.  Id. at 200.)

D. Reliance or Transaction Causation

To establish a violation of Section 10(b), a plaintiff must demonstrate by a preponderance of the credible evidence that but for a material misstatement or omission, plaintiff would not have engaged in the securities transaction – thus establishing "transaction causation". Dura, 544 U.S. at 346; Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, 552 U.S. 148, 159 (2008); Lentell, 396 F.3d at 172; see also Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc., 343 F.3d 189, 197 (2d Cir. 2003); Castellano v. Young & Rubicam, Inc., 257 F.3d 171, 179 (2d Cir. 2001). Reliance upon a "deceptive act" ensures that there is a causal connection between an asserted misrepresentation or omission and the injury about which

plaintiff complains. <u>Stoneridge Inv. Partners</u>, 552 U.S. at 159. In instances in which there has been a material omission by one with a duty to disclose, reliance is presumed. <u>Id.</u>

As part of this inquiry, courts assess whether reliance was reasonable. <u>Emergent Capital</u>, 343 F.3d at 195. To make this determination, courts consider the entire context of the transaction "including factors such as complexity and magnitude, the sophistication of the parties, and the content of any agreements between them." <u>Id.</u> (citations omitted.) In <u>Harsco Corp. v. Segui</u>, 91 F.3d 337, 342 (2d Cir.1996) (cited in <u>Emergent Capital</u>), the Second Circuit eliminated a securities law claim, finding that a written disclaimer between the parties and the parties' sophistication made any reliance by plaintiff unreasonable. <u>Id.</u> The Court in <u>Emergent Capital</u> also noted approvingly a case in which the 10b-5 claim was dismissed on the grounds that a party could have inserted appropriate protective language into an agreement regarding assumed fact, but did not. <u>Id.</u> That party willingly assumed the attendant business risks. <u>Id.</u> In <u>Emergent Capital</u> itself, the buyer's reliance on the alleged misrepresentations was not found to be reasonable in light of its statement in the transaction documentation that it "had knowledge and experience in financial and business matters" and should have protected itself, but did not, by requiring additional representations in the documentation. <u>Id.</u> at 196. The Second Circuit found that this combination of circumstances precluded a finding of reasonable reliance as a matter of law. <u>Id.</u>[17]

---

[17] Plaintiff's implicit assumption that the status of the Project schedule in March 2007 meant that it could not experience future delays is undercut by its own loss causation expert, Nolan, who testified

### E. Loss Causation

The fact that plaintiff lost nearly its entire investment in the Project is not contested.[18] However, plaintiff must still prove loss causation – the "causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." Emergent Capital, 343 F.3d at 197; see also Lentell, 396 F.3d at 172. This has been codified by statute as requiring that "the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4).

The Second Circuit has held that a "misstatement or omission is the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk concealed by the misrepresentations and omissions alleged by a disappointed investor." Lentell, 396 F.3d at 173 (emphasis in original); In re Flag Telecom Holdings, Ltd. Sec. Litig., 574 F.3d 29, 40 (2d Cir. 2009).

In Lentell, the Second Circuit further described loss causation as requiring both that the loss be foreseeable and that the loss be caused by the materialization of the concealed risk. Id. at 173; see also Emergent Capital, 343 F.3d at 193, 198 (loss causation satisfied where the plaintiffs "specifically asserted a causal connection between the concealed information . . . and the ultimate failure of the

---

that delays and cost overruns are inherent in any construction project. (See Nolan Dep. at 40 20-22, 151:6-9, 152:6-8, 42:17-23.)

[18] Zamir negotiated a sale of the commercial portion of the building, resulting in some return to investors. (Tr. at 625-27.) Plaintiff's portion amounts to approximately $400,000. (Id.) At this point in time, plaintiff has not accepted that amount and it is being held in escrow by counsel for defendants. (Id.)

venture.") Foreseeability links the misstatement or the omitted information to plaintiff's loss. See Lentell, 396 F.3d at 173 (citing Castellano, 257 F.3d at 188.)

In Castellano, the Second Circuit further described the "materialization of the risk concept" in the following manner

> If the significance of the truth is such as to cause a reasonable investor to consider seriously a zone of risk that would be perceived as remote or highly unlikely by one believing the fraud, and the loss ultimately suffered is within that zone, then a misrepresentation or omission as to that information may be deemed a foreseeable or proximate cause of the loss.

Id. at 188.  There mere fact that a misrepresentation or omission "touches" upon a loss is not enough. See Dura, 544 U.S. at 343. The securities laws provide for recovery only when a misrepresentation or omission causes a loss. Id.

The key aspect of loss causation in a "materialization of a concealed risk" case is the relationship between the loss and the information misstated or concealed by the defendant. Lentell, 396 F.3d at 174. "If that relationship is sufficiently direct, loss causation is established." Id. In Lentell, the Court also stated that "if connection is attenuated, or if the plaintiff fails to 'demonstrate a causal connection between the content of the alleged misstatements or omissions and the 'harm actually suffered' [citation omitted], a fraud claim will not lie." 396 F.3d at 174.  In Lentell the Second Circuit also recognized that "'when the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases'" Id. at 174. (citing First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 772 (2d Cir. 1994.)

44

In <u>Lattanzio v. Deloitte & Touche LLP</u>, 476 F.3d 147, 157 (2d Cir. 2007), the Second Circuit elaborated the circumstances in which a risk falls outside the "zone" of risk. There, Deloitte & Touche had been sued for securities fraud in connection with its audit of a company that subsequently entered bankruptcy. The Court found that "the relevant risk – the risk that was concealed by Deloitte's misstatements and that materialized to cause their loss – was not the risk of the [company's] bankruptcy, but the risk that Deloitte's audits were not conducted in accordance with generally accepted accounting practices." <u>Id.</u> The "zone" of risk is determined by the purposes of the securities laws, <u>i.e.</u>, "to make sure that buyers of the securities get what they think they are getting." <u>In re Omnicom Group, Inc. Sec. Litig.</u>, 597 F.3d 501, 513 (citation omitted).

The Supreme Court has recognized that all else being equal, the longer the period of time between the alleged misrepresentation or omission and the loss, the more likely it is that other factors caused the loss. <u>Dura</u>, 544 U.S. at 343; <u>see also</u> <u>Wiliamowsky v. Take-Two Interactive Software, Inc.</u>, 818 F.Supp.2d 744, 752 (S.D.N.Y. 2011).

### F. Control Person Liability

Section 20(a) of the 1934 Act imposes liability on "control persons." Section 20(a) provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

45

15 U.S.C. § 78t(a). To sustain a claim of control person liability under Section 20(a),
plaintiffs must prove by a preponderance of the credible evidence that (1) there was
a primary violation by a controlled person, (2) the "controlling" defendant controlled
the primary violator, and (3) the defendant who is alleged to be the controlling
person was, in some sense, a culpable participant in the controlled person's fraud.
See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 108 (2d Cir. 2007).
Courts in the Second Circuit have found that a primary violation combined with a
sufficient level of control constitutes "culpable participation." See, e.g., S.E.C. v.
First Jersey Sec., Inc., 101 F.3d 1450, 1472 (2d Cir. 1996)("plaintiff must show a
primary violation by the controlled person and control of the primary violator by the
targeted defendant"); In re Refco, Inc. Sec. Litig., 503 F. Supp. 2d 611, 660 (S.D.N.Y.
2007); In re Alstom SA, 406 F. Supp. 2d 433, 487 (S.D.N.Y. 2005).

### III. DISCUSSION

This Court's findings of fact and conclusions of law lead to only one outcome:
judgment for defendants. The Court could enter judgment for defendants based on
plaintiff's failure as to any one of the elements – and plaintiff fails as to each one.

### A. No Actionable Misstatements or Omissions

Plaintiff has failed to demonstrate by a preponderance of the credible
evidence that defendants made a single material misstatement or omission.

As set forth at the outset, plaintiff alleges a host of misstatements: that the
Project was running smoothly (i.e., on time and on budget); that it was

46

"functionally" bought out; that no part of the contingency funds had been used; that the G702 was an internal document and could not be provided; that Javeri's father was selling only a "portion" of "his" interest; that the purchase needed to close by March 23; that the Pro Forma plaintiff was provided pre-acquisition and the Excel spreadsheet that Shah and Mehta prepared based on that Pro Forma were accurate; and that cost overruns would be paid for by an entity with which the 40 Broad Project had a branding relationship, the Setai Group.

In terms of omissions, plaintiff alleges that it was not told that Javeri was selling his entire personal interest and that what was listed on the capital account statement was his family's and not his; that Javeri failed to disclose an email exchange in early March 2007 relating to an "ACR" or that a meeting had been set up with the lender at which the ACR would be a topic of conversation; that the timeline defendants had provided was not the actual timeline; and that the construction drawings were not complete.

The alleged misstatements and omissions are overlapping and go to two topics: (1) one way or another addressed to the issues of timing and budget; or (2) addressed to the issue of whether Javeri and Zamir were dishonest regarding their remaining interests in the Project – that is, whether they retained "skin in the game" after the sale to plaintiff.

Plaintiff's case relies on a misreading of the Pro Forma that plaintiff was provided in March 2007. (Pl.'s Ex. 7.) It is clear that plaintiff was provided written information which indicated that the Project had an expected completion date of the

47

fall of 2008 – and that this date remained the expected date of completion well past the date of plaintiff's acquisition.

Plaintiff in fact confirms this understanding in Shah's PowerPoint presentation to investors stating a projected completion date of the fall of 2008. (Defs.' Ex. RRRR at 7.)  The timeline is also confirmed by the bank loan documentation (Pl.'s Ex. 10) and correlative testimony from numerous witnesses. Plaintiff's claim that the project was <u>not</u> running smoothly also rests on two emails from a man, Amirian (Pl.'s Exs. 10, 20), whom plaintiff never bothered to call at trial, but who was described as factually wrong and melodramatic by the credible witnesses who did testify.

Finally, plaintiff was represented in its acquisition by a managing member, Shah, and his colleague, Mehta, who had absolutely no experience in projects of the type of 40 Broad.  They visited the construction site pre-acquisition. Shah and Mehta never sought the opinion of a construction manager as to the status of the Project or likely risks.  Plaintiff never sought any representations regarding timeline or budget in the transaction documents.

As the Court has found, the preponderance of the credible evidence demonstrates that as of March 29, 2007, the Project was in fact running smoothly. It was proceeding according to the schedule provided to plaintiff and it was expected to come in on budget, resulting in a profit for investors. Shah and Mehta were provided a construction schedule and financial information that accurately reflected defendants' expectations as of March 2007.  Running smoothly for a construction

48

project need not mean running without any issue whatsoever. That would create an unattainable standard for construction and is not what the securities laws require. But it is clear that in all major respects, that Project was in fact proceeding as expected; it is clear that defendants' statements in this regard were true when made.

The Court has also found that plaintiff was not misled about Zamir and Javeri's "skin in the game." Prior to plaintiff's securities purchase, Shah also had specific, documentary information stating that it was buying Atit Javeri's personal interests; plaintiff never inquired whether what was being purchased was the entirety of Javeri's interests or requested a specific representation be included in the transaction documents. As to Zamir's interest, the Court finds that any potential omission of the fact that the interest reflected on the capital account sheet provided to Shah on the day of the closing belonged to Zamir's family members, rather than Zamir personally, could not be material. Zamir testified that he did not distinguish between the two, and there is no evidence in the record that Zamir would have been less vigilant about running the Project if he were protecting his family's interests, rather than than his own. The Court finds that Zamir's additional $11 million investment is strong corroborating evidence of his commitment and belief in the Project. While he could have issued an additional capital call to get a pro rata contribution from all investors he instead put his own money at risk (to Shah's great relief, as he expressed in an email).

Defendants cannot be held liable for securities fraud because plaintiff misunderstood the documents provided, could not accurately judge progress of the building construction, did not think to retain experts who could evaluate that progress, and did not recall being informed of facts about which the evidence demonstrates they were informed.

B. Materiality

There is little doubt – and defendants did not attempt to argue otherwise – that if there truly had been an affirmative attempt to mislead plaintiff regarding the status of the Project as of March 2007 – and if it had been in an irreversible "death spiral" – defendants' pre-March 2007 statements to the contrary would have been material. However, that was not the case. The Court need not, therefore, walk through each asserted misstatement and omission to determine whether it was material.

C. No Culpable State of Mind

Plaintiff has argued that, since Javeri sold his entire interest and Zamir the bulk of his personal interest, both Javeri and Zamir demonstrate the requisite scienter – the culpable state of mind – to support plaintiff's claim for securities fraud. The Court disagrees.

There is no doubt that Zamir and Javeri did benefit personally from the sale of their interests to plaintiff. Plaintiff knew this at the time; Shah knew he was buying personal interests of two of the individuals involved in the Project. To put it in the terms Shah used at trial, he knew as matter of hard, unassailable fact that,

dollar for dollar, his purchase reduced their "skin in the game". However, the fact that one has personally benefitted from a securities transaction does not, ipso facto, mean that he must have defrauded the purchaser. As a society, that nadir has not been reached.

Certainly it is true that personal benefit may provide the basis for an inference of scienter – and assertions of such benefit may be enough in certain circumstances to get a case past the pleading stage. But now, at trial, plaintiff bears the burden of proving by a preponderance of the credible evidence that this negative inference is fairly drawn. Plaintiff has failed to do so.

As stated above, the Court credited Zamir's statements as to the reasons for his sale of his interest; it is not persuaded that the remaining familial interest was insufficient to motivate him to push the Project to succeed. In addition, the Court credits the statements of Zamir and Javeri that as of March 2007, they expected the Project to come to a successful conclusion. There is no credible evidence in the record that defendants thought the Project was in a "death spiral", wanted out, and engaged in fraud to make that happen. The Court also notes that defendants' General Counsel at the time, Bilenker, also testified credibly that in March 2007 the Project was running smoothly and the October 2008 completion date seemed very secure. This further undercuts defendants' intent to defraud Delshah.

D. Lack of Reliance or Transaction Causation

Even assuming that plaintiff had proven that defendants had made material misstatements or omissions with requisite scienter, its securities claim would fail

51

for lack of transaction causation. Plaintiff has not proven by a preponderance of the credible evidence that, but for those misstatements or omissions, it would not have engaged in the securities purchase.

The preponderance of the credible evidence is that plaintiff's primary reason for buying into the Project was a hot real estate market – the rising price per square foot of unit sales. Plaintiff had not been promised that the Project would never experience any delays. Nor was it promised that Setai would cover any overruns.[19] In the context of a New York City construction project, a certain amount of delay and cost overrun is reasonably expected. (Tr. at 2383-86 (Plaintiff's expert Nolan explaining inherent risks).) There is also significant evidence that plaintiff's primary and continuing focus – from beginning to end – was on sale prices for units. (See Defs.' Exs. BBB (Mehta March 2008 email requesting information on sales prices), RRRR (Delshah PowerPoint emphasizing sales prices); Tr. at 848 (Shah testifying sales prices were important), 1092-94 (Shah testifying he also worked to sell units in 40 Broad to receive a brokerage commission).)

In addition, plaintiff had the opportunity to view the Project and assess progress; Shah and Mehta visited the site. However, neither Shah nor Mehta had the requisite experience to assess this type of construction project and despite the fact that they were investing millions of dollars of other people's money in it, they

---

[19] No evidence adduced at trial suggested that defendants made material misstatements regarding the role of Setai in covering any cost overruns prior to March 2007. An email from Javeri to Mehta on June 29, 2007 stated, "we have a clause in our contract with Setai that states that they will be fully responsible for any and all overruns caused by Dennison Design". (Tr. at 1544-47; Pl.'s Ex. 26.) However, no Delshah representative testified that such information was provided prior to March 2007 or that Delshah relied on such information.

neither sought out the construction manager (tr. at 1003) nor brought someone along with the appropriate expertise – something Shah, as a trained corporate attorney, should have known to do. Defendants are not responsible for plaintiff's failings in this regard.

Plaintiff neither sought out nor received a representation in the transaction document that the Project was "on schedule" and, more importantly, that under no circumstances would the first TCO be obtained after June or July 2008. Plaintiff could have sought such a representation but did not. As in Emergent Capital, this renders its reliance unreasonable. 343 F.3d at 196. In addition, however, the transaction documentation also specifically stated that plaintiff acknowledged that the investment was highly risky and speculative, illiquid, and that plaintiff could lose the entirety of its investment. (See Pl.'s Ex. 56 at 2 ("Economic Risk").) Plaintiff also acknowledged that it is an experienced investor in unregistered and restricted securities of speculative and high-risk ventures. (Id. at 3.) In the face of these specific acknowledgments, plaintiff's expectation of a return certain is all the more unreasonable. See Emergent Capital, 343 F.3d at 196.

It was also unreasonable for plaintiff to have relied solely on Javeri – whom Mehta characterized as possibly only an intern – for information about the Project. Javeri was involved in sales and marketing; he was not "the project manager" and the Court has found did not represent himself as such. If Shah and Mehta wanted specific and solid information regarding the precise status and budget of the Project, they should have sought out individuals with the relevant expertise. They did not.

For that failing, defendants are not responsible. In short, plaintiff's reliance on Javeri for the virtually all of the information they claim to have been misstated or omitted was unreasonable.

In addition, the Court does not find that "but for" the alleged misstatements and omissions, plaintiff would not have entered into the transaction. For instance, the fact that Javeri's "father" was allegedly selling only a "portion" of his interests does not satisfy transaction causation. Nor does the Court find that plaintiff would not have invested "but for" a showing that Zamir's entire interest in the capital account belonged to him personally, rather than to his family. Plaintiff has conceded that the "G702" is a "red herring" – and has not suggested that had plaintiff known that it could have gotten the G702, or had it reviewed the G702, that it would not have entered into the transaction. Finally, plaintiff failed to prove that any omissions regarding the data in Shah's Excel spreadsheet,[20] or those regarding the fact that the construction drawings were incomplete as of March 2007[21] (tr. at 2471-73), or that Zamir benefitted from concealed agreements regarding the Restaurant and Spa[22] satisfied transaction causation.

---

[20] Plaintiff alleged that it submitted its Excel model, based on the data in the Pro Formas, for Javeri to review – and that Javeri verified that model. (Tr. at 673.) However, Javeri testified credibly that he merely passed along the data contained in the Pro Forma documents associated with the Project and did not verify those numbers himself. (Tr. at 1417-20.)

[21] There is no evidence that plaintiff requested a representation that the drawings were complete, asked whether they were complete, or had the expertise to interpret construction drawings. As a matter of proof, then, plaintiff fails to demonstrate how an omission related to the drawings would satisfy either transaction causation or loss causation.

[22] Plaintiff failed to introduce evidence showing that the alleged omissions regarding the Spa and Restaurant were material. Shah expressed dismay that the Project's loan arrangements permitted Zamir to "subsidize" the build-out of the Spa and Restaurant, with no benefit to the Yahalom investors. (Tr. at 925.) However, defendants' expert Falsetta testified that the mere fact that the Spa and Restaurant did not pay rent to 40 Broad LLC for several years would not necessarily decrease the overall value of the Project. (Tr. at 2502-03.)

### E. Loss Causation

Even assuming that plaintiff was able to prove each of the other elements discussed above, it still failed to prove loss causation. Plaintiff's primary argument on loss causation is that concealed delays and cost overruns in March 2007 carried through and "materialized" into the ultimate failure of the Project in 2009. Even if sound as a matter of law, this argument fails for lack of proof.

The Court raised concerns with a lack of loss causation at the outset of the case and requested briefing mid-trial on the issue. The holes in plaintiff's loss causation case were evident and manifold. Plaintiff bore the burden of demonstrating by a preponderance of the credible evidence that the materiality of the allegedly concealed risk caused its loss. To state the obvious, the risk which materialized must have been concealed; the specific materialization of those particular concealed risks must be demonstrated to be proximately connected to plaintiff's loss. See Lentell, 396 F.3d at 173; In re Flag Telecom Holdings, Ltd. Sec. Litig., 574 F.3d at 40; Lattanzio, 476 F.3d at 157. Plaintiff has failed to carry its burden. Specifically:

1. Plaintiff never connected any of the alleged schedule delays it asserts existed in March 2007 to any particular cause; there is therefore a failure of proof as to whether any of the schedule delays present in March 2007 in fact impacted the timing of obtaining the TCOs at all. Plaintiff expects the Court can assume this connection – it cannot.

2.  The Project ultimately failed when a large number of buyers rescinded their contracts in 2009.  Plaintiff also never connected the alleged schedule delays in March 2007 to the fact that in 2009, when offered the opportunity to rescind, buyers took advantage of that opportunity at such a rate that the Project failed.  Plaintiff needed directly to tie the alleged March delays and budget overruns to those rescissions in some fashion. Apart from asserting "it must be so", it did not.

3.  Plaintiff failed to rebut the evidence put forward by Bilenker that the scheduling delays which impacted the Project began to occur in the spring and summer of 2007 – after plaintiff's purchase.

4.  Plaintiff failed to rebut the evidence that as of the date that Shah and Mehta became aware of cost overruns and delays (the Summer of 2007) – that is, when the alleged "truth came out" – the Project was still expected to be profitable; unit sales were continuing and the price per square foot was rising. This expected profitability interrupts any causal claim back to March 2007.

5.  Plaintiff failed to rebut the evidence that as of the date the alleged "truth came out" that it was not possible for the TCOs to have been obtained in time to have avoided the Attorney General's order of rescission.

6.  Plaintiff has failed to connect the Attorney General's order of rescission to the failure to make a genuine closing on a unit.  In its case, plaintiff assumed that the Court would accept as fact that the closing on the unit

that occurred in July 2008 was not accepted by the Attorney General as "real" and that the order of rescission therefore followed. The Court heard argument in this regard, but no competent evidence was offered on this point.

7. Plaintiff failed to rebut the evidence proffered by defendants that the reason the Project failed was the rate of rescission – and that that rate was related primarily to market conditions. In the absence of a financial and real estate crisis that Mehta testified was unexpected and akin to a "plague", there is no evidence that an order allowing rescission would have resulted in so many buyers backing out, causing the Project to fail.

8. Plaintiff has not rebutted defendants' evidence that up until some point in 2008, rising price per square foot unit sales were expected to offset any cost overruns, and the Project would still have been profitable.

9. Plaintiff's own expert stated that schedule delays and budget overruns are inherent in any project – these were not "concealed" risks.

In addition to all of these specific issues is plaintiff's overarching misidentification of the "zone of risk" within which defendants' alleged misrepresentations regarding schedule and budget reasonably reside. Even if this Court assumes, arguendo and against the preponderance of the credible evidence, that defendants misrepresented that the Project was "running smoothly" in March 2007, those statements relate only to general delays and the risks associated with those delays. They do not relate specifically to the date that the Project would

obtain the first TCO, nor that a unit would not close on a particular schedule, nor the rate at which buyers rescinded their contracts. Thus, there is a mismatch between the zone of risk and the Project's failure.

Here, as in Lattanzio, the alleged misrepresentations fall outside of the zone of concealed risk. See Lattanzio, 476 F.3d at 157. The concept of proximate cause for the purpose of the securities laws is not as sweeping as that in tort law; rather, the proximate cause analysis for the purposes of the securities laws ensures only that investors "get what they think they are getting.'" Omnicom, 597 F.3d at 513. The risk of an unprecedented crash in the financial and housing markets was present irrespective of any misrepresentations regarding the Project schedule or cost overruns. It was not concealed. Defendants could only be held responsible for the damage that was reasonably related to the alleged misrepresentations and omissions; an epic financial crisis was not one of those risks. That all investors in the 40 Broad Project lost large sums of money is evident. But it was not because of securities fraud.

F.  No Control Person Liability

Finally, an essential element of a claim for control person liability under Section 20(a) of the Securities Exchange Act of 1934 is a primary violation. Plaintiff here has failed to make out a primary violation pursuant to Rule 10(b). Its § 20(a) claim therefore fails as a matter of law.

CONCLUSION

For the reasons set forth above, plaintiff has failed to make out a claim pursuant to §§ 10(b) or 20(a) of the Exchange Act with respect to any named defendant.  Indeed, it is not even a close call.

The Clerk of Court is directed to enter judgment for defendants and to terminate this case.

SO ORDERED.

Dated:      New York, New York
            May 28, 2013

_____
KATHERINE B. FORREST
United States District Judge

59